IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ELIA T. WATKINS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-16-1033 |
| JOHN CULLEN, et al., | * | |
| Defendants. | * | |

*****

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants John Cullen, Sherri Passerell, Lauren Lyons, Lee Cashdollar, Dan Brown, Richard Mihailovich, Laura Robinson, Terri Emerson, Janet Hendershot, Mary-Lou Perkins, Sharon Pence, Joseph Lyden, and Gary Leasure's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 27) and Motion to Consolidate Case Nos. 1:16-cv-01033-GLR and 1:17-cv-00277-GLR ("Motion to Consolidate")[1] (ECF No. 26).[2] The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons

---

[1] On February 13, 2018, the Court reassigned case numbers JFM-16-1033 and JFM-17-277 to the Honorable George L. Russell, III. Accordingly, the case numbers now reflect the judge currently assigned to the cases.

[2] Also pending are Plaintiff Elia T. Watkins' three "Motions for Summary Judgment" (ECF Nos. 24, 34, 35). In his Motions, Watkins either repeats his allegations against Defendants or takes issue with how Defendants' counsel is handling this case; he does not present any arguments related to why the Court should grant judgment in his favor. Accordingly, the Court will deny Watkins' Motions. In addition, Watkins' Motion to Strike the State's Response/or Motion for Extension of Time (ECF No. 32) is pending. In his Motion, Watkins requests thirty additional days to respond to Defendants' Motion but offers no cognizable reason for striking the Motion. Accordingly, the Court will deny Watkins' Motion to Strike and grant nunc pro tunc the Motion for Extension of Time.

outlined below, the Court will deny the Motion to Consolidate and grant the Motion for Summary Judgment.

## I.  BACKGROUND[3]

### A.  The Complaint and Supplements to the Complaint

Plaintiff Elia T. Watkins, who currently resides at the Spring Grove Hospital Center in Catonsville, Maryland, filed this civil rights action pursuant to 42 U.S.C. § 1983 (2018).[4] (ECF No. 1). Watkins' initial Complaint was a lengthy list of grievances against a variety of employees of the Thomas B. Finan Center (the "Finan Center")[5] in Cumberland, Maryland and a state court judge. (See Compl., ECF No. 1). The specific nature of Watkins' Complaint, as well as how each of the named Defendants was responsible for the facts alleged, was unclear from Watkins' filing. The Court, therefore, granted Watkins twenty-eight days to supplement his Complaint to cure the deficiencies noted. (June 2, 2016 Order, ECF No. 5). In response to the Order, Watkins filed two Supplements to the Complaint. (ECF Nos. 6, 8). Neither of Watkins' Supplements is a model of clarity. At bottom, Watkins alleges that Finan Center

---

[3] Unless otherwise noted, the facts outlined here are set forth in Watkins' Complaint (ECF No. 1) and First and Second Supplements to the Complaint (ECF Nos. 6, 8). To the extent the Court discusses facts that Watkins does not allege in his Complaint and Supplements, they are uncontroverted and the Court views them in the light most favorable to Watkins.

[4] In his First Supplement, Watkins alleges that Finan Center staff violated Md. Code Ann., Health-Gen. ["HG"] §§ 10-701 et seq. (West 2018). These statutory provisions impose only criminal liability; they do not create a civil cause of action. See HG § 10-1003.

[5] The Thomas B. Finan Center is a hospital within the Maryland Department of Health's Behavioral Health Administration. HG §§ 2-106(a)(5), 10-406(a)(6) (West 2018).

employees treated him improperly, breached his confidentiality, and failed to protect him from assaults by a fellow Finan Center patient.[6]

With regard to Watkins' specific allegations, he states that John Cullen, Director of the Finan Center, "did not do anything to reprimand any of his employees." (2d Suppl. Compl. at 4, ECF No. 8).[7] As to the Finan Center employees, Watkins alleges that Dr. Passerell placed unlawful restrictions on him and had a prejudicial attitude towards him. (Compl. at 10; 1st Suppl. Compl. at 2, ECF No. 6). He states that at times Dr. Passerell would not speak to him, (Compl. at 11), and that she and members of her treatment team, including Defendants Dr. Lyons, Cashdollar, Brown, Emerson, and Robinson, were unprofessional and used "levels of precautions as a punitive measure, instead of a safety measure," (id. at 12; 1st Suppl. Compl. at 2).

Watkins then alleges that it was "inappropriate legally" for Dr. Hendershot and Perkins to submit a letter to an Administrative Law Judge ("ALJ") after a hearing on his conditional release was closed. (Compl. at 7; 1st Suppl. Compl. at 3). Watkins also avers that, during the hearing, Dr. Hendershot falsely testified that Watkins inappropriately touched a fellow patient. (Compl. at 7–8). Additionally, Watkins alleges

---

[6] In his Complaint, Watkins alleges that Judge Gary Leasure of the Circuit Court Allegany County, Maryland wrongly excused the state employees from his state court lawsuits because they are immune from suit. (Compl. at 2–3). In his Opposition, however, Watkins states that he "did not try to sue the Honorable Judge Gary Leasure in any of his complaints." (Pl.'s Resp. at 3, ECF No. 33). Accordingly, the Court will dismiss Judge Leasure from the case.

[7] Citations to the Second Supplement to the Complaint refer to the pagination assigned by the Court's electronic case management system.

that Mihailovich and Shaw failed to return art work to him. (Id. at 19; 1st Suppl. Compl. at 5).

Next, Watkins states that Dr. Hendershot breached patient confidentiality by allowing student nurses and other non-employees to sit in on his treatment plan meetings without his consent. (1st Suppl. Compl. at 2). He alleges that this caused some of the female students to have a negative attitude toward him. (Id.). He further alleges that some of the unspecified negative attitudes appeared to have racial overtones. (Id. at 4).

Finally, Watkins asserts that Pence made several false reports regarding Watkins assaulting fellow patients. (Compl. at 17; 1st Suppl. Compl. at 5). He also alleges that Lyden made false reports regarding Watkins threatening him, failed to stop an assault on Watkins, and then participated in the assault on Watkins. (Compl. at 18; 1st Suppl. Compl. at 6).

**B.** **Record Evidence**

In 1993, Watkins was found Not Criminally Responsible for child abuse and a third-degree sex offense and was admitted to Clifton T. Perkins Hospital Center. (Defs.' Mot. Dismiss Mot. Summ J. ["Defs.' Mot."] Ex. 10 at 1, ECF No. 30-12).[8] In November 2012, Watkins was transferred to the Finan Center, (id.), where he remained a patient until October 2016, (Defs.' Mot. at 2; Pl.'s Resp. at 4, ECF No. 36).

On May 8, 2015, a hearing was held before an Administrative Law Judge ("ALJ") regarding Watkins' request for conditional release. (Defs.' Mot. Ex. 10 at 1). At the

---

[8] Citations to the Exhibits to Defendants' Motion refer to the pagination assigned by the Court's electronic case management system.

hearing, Dr. Hendershot testified in support of Watkins' request. (Id. at 2). Following the hearing, Watkins engaged in assaultive behavior, refused medication, and declined to participate in various groups. (Defs.' Mot. Ex. 4, ECF No. 30-5). As a result, Dr. Hendershot felt that she and the treatment team could no longer support Watkins' conditional release. (Defs.' Mot. Ex. 9, ECF No. 30-11). Therefore, on May 11, 2015, Dr. Hendershot notified the ALJ and Watkins' attorney, through a letter, that Finan Center staff no longer recommended Watkins' conditional release. (Id.). Subsequently, the ALJ denied Watkins' request for conditional release. (Defs.' Mot. Ex. 10 at 5). In denying the request, the ALJ stated that he was not persuaded by the joint recommendation for conditional release presented during the hearing. (Id. at 5). His decision did not rely on, or even reference, the letter withdrawing the recommendation for release. (See id. at 1–6). The ALJ did, however, forward the letter to the Circuit Court for Baltimore County, Maryland to consider in conjunction with the ALJ's recommendation. (Defs.' Mot. Ex. 11, ECF 30-13).

After the hearing, Watkins' patient record notes dated May 10, 2015, indicate that Watkins' level of "supervision/precautions" was increased from "unescorted" to Aggressive Assault Precaution, Level 1 ("AAP1") due to him being involved in a physical altercation with another patient. (Defs.' Mot. Ex. 4 at 1, 3, ECF 30-5). Later that day, Watkins got in another fight with a different patient. (Id.). On May 12, 2015, he acted aggressively toward staff. (Id. at 5). On May 14, 2015, a female patient accused Watkins of touching her breast. (Id. at 10). Finan Center staff observed Watkins shouting angrily at staff and other patients on May 18, 2015. (Id. at 15). On May 20,

5

2015, Watkins was removed from AAPI precautions and placed on unit restrictions, which required him to keep a ten-foot distance from female patients at all times. (Id. at 18). The patient notes indicate that Watkins had demonstrated "no assaultive or aggressive behaviors" over the last couple of days and would be monitored on unit restrictions instead of fifteen-minute checks. (Id.).

The following month, Watkins again exhibited aggressive behavior. On June 12, 2015, Watkins threatened staff, stating, "You don't know who I am and what I can do. I will get you one day, be careful going home." (Defs.' Mot. Ex. 13 at 1, ECF 30-15). On June 18, 2015, Dr. Passerell entered a progress note confirming that Watkins was on restricted status due to his behavior. (Defs.' Mot. Ex. 5a at 1, ECF 30-6; Defs.' Mot. Ex. 5b at 1, ECF 30-7). She noted that Watkins requested his level be changed from "escorted status" to "unescorted status." (Defs.' Mot. Ex. 5a at 1). Dr. Passerell reported that the treatment team considered Watkins' request but ultimately denied it. (Id.). The treatment team advised Watkins that his level would not change as requested "due to his threats towards staff [and] refusal to ask vulnerable females to keep a [ten-foot] distance from him." (Id.). Watkins responded that he would not keep a ten-foot distance from vulnerable females because that was "the staff's job." (Id.). Watkins also became "very loud and hostile." (Id.).

In July 2015, Watkins' level of supervision was raised back to AAPI precautions. Patient record notes dated July 19, 2015 indicate that Watkins' level of supervision was raised from "staff escort" to AAPI precautions due to Watkins pacing angrily around the day room and then pushing another patient out of the way instead of going around him.

6

(Defs.' Mot. Ex. 12, ECF No. 30-14). Then, on July 23, 2015, Watkins was involved in an altercation with another patient. (Defs.' Mot. Ex. 13, ECF No. 30-15; id. Ex. 14, ECF No. 30-16). The following day, Lyden wrote an account of the incident and identified Watkins as the aggressor. (Defs.' Mot. Ex. 14 at 1–3). Lyden restrained Watkins in an attempt to break up the fight between Watkins and the other patient. (Id. at 2).

On July 24, 2015, Dr. Passerell entered a physician's note that details almost daily incidents of aggressive behavior and verbal threats made by Watkins against staff from June 2, 2015 through July 23, 2015. (Defs.' Mot. Ex. 13). In the note, Dr. Passerell documents that Watkins continued to be argumentative and refused to take responsibility for his actions. (Id. at 1). At various times during the documented time period, Watkins refused to take prescribed medications. (Id. at 1–4). He threatened staff physically, threatened to initiate litigation and grievances, and indicated that the rules did not apply to him. (Id. at 1–2, 4). He also engaged in numerous confrontations with other patients and staff. (Id. at 2–4).

With regard to Watkins' artwork, Mihailovich, the nursing supervisor of Cottage 2 at the Finan Center, avers that he never possessed one of Watkins' drawings or paintings. (Mihailovich Aff. ¶ 4, ECF No. 30-8). Shaw, an Occupational Therapist Assistant at the Finan Center, avers that she did receive a gift of a drawing from Watkins but water damage destroyed the picture and she threw it away. (Shaw Aff. ¶¶ 4–5, ECF No. 30-9).

As to Watkins' concerns that his confidentiality was breached, Defendants aver that student nurses, contractual staff, and volunteers, are all subject to per the Finan Center's confidentiality policy. (Defs.' Mot. Ex. 8 § 1(a)(5) (contractors); § 1(b)(4)

(students); § 5 (volunteers)). The Finan Center shares confidential health information with these individuals for treatment purposes, and they are bound to maintain the patient's confidentiality. (Id. at § 7).

## II. DISCUSSION

### A. Motion to Consolidate

Under Federal Rule of Civil Procedure 42(a), the Court may consolidate cases that "involve a common question of law or fact." Defendants seek to consolidate this case with Watkins v. Cullen, et al. (Watkins II), No. GLR-17-277 (D.Md. filed Jan. 31, 2017). Watkins opposes the Motion, arguing that the cases are against "two different treatment teams" and involve "different rights violations that occurred about one year apart." (Pl.'s Resp. at 2, ECF No. 33). The Court agrees with Watkins.

Here, although the bulk of Watkins' allegations in this case and in Watkins II relate to the treatment Watkins received while at the Finan Center and most of the Defendants are Finan Center employees,[9] the factual allegations in this case and Watkins II span different timeframes and involve different Finan Center employees. Further, none of the Defendants in Watkins II has been served with the Complaint. Accordingly, the Court will deny the Motion to Consolidate.

---

[9] With the exception of Christopher Gozdor, an attorney, "GSR" a fellow patient, and the Honorable Judge Gary Leasure, a state court judge, Defendants are all employees of the Finan Center.

B.  **Motion to Dismiss or, in the Alternative, Motion for Summary Judgment**

   1.  **Conversion to a Motion for Summary Judgment**

In this case, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. A motion styled as a motion to dismiss or, in the alternative, for summary judgment implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d).

The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)). The Court's complete discretion is guided by the United States Court of Appeals for the Fourth Circuit's two-part test for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion. Under this test, the "parties [must] be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment" and "the parties [must] first 'be afforded a reasonable opportunity for discovery.'" Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013) (quoting Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985)).

When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005).

Here, Defendants caption their Motion in the alternative and rely on exhibits attached to their Motion. Watkins does not oppose conversion of the Motion into one for summary judgment through a Rule 56(d) affidavit or its equivalent. Accordingly, because the Court will consider Defendants' exhibits, the Court must convert the Motion to a motion for summary judgment.

## 2. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and

declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.** **Analysis**

Defendants contend that Watkins' factual allegations either do not rise to the level of a constitutional violation and, even if they could, the evidence establishes that Watkins' treatment was clinically appropriate.[10] The Court agrees.

**1.** **Supervisory Liability**

Watkins alleges that John Cullen, CEO of the Finan Center was ultimately responsible for the conduct of his employees and did nothing to reprimand them. It is well established that the doctrine of respondeat superior does not apply to § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of

---

[10] Defendants also argue that they have Eleventh Amendment immunity and qualified immunity. Because the Court will grant summary judgment against the remaining Defendants based on the evidence in the record, it does not address these arguments.

constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Watkins does not allege, and provides no evidence that, Cullen acted with actual or constructive knowledge of Finan Center employees' conduct, or that such conduct posed a pervasive and unreasonable risk to Finan Center patients. Nor has he alleged or provided evidence of an inadequate response or affirmative causal link. Thus, the Court concludes that Watkins has failed to establish a § 1983 claim against Cullen.

### 2. Lost Artwork and Confidentiality Claims

Watkins pleads that Mihailovich and Shaw failed to return artwork he gave to them. "[N]ot all undesirable behavior by state actors is unconstitutional." Pink v. Lester, 52 F.3d 73, 75 (1995) (citing Paul v. Davis, 424 U.S. 693, 701 (1976)). Here, even if Watkins presented evidence to support his allegations, failing to return a gift does not rise to the level of a constitutional injury.

Likewise, Watkins' allegation that Dr. Hendershot breached his confidentiality fails to identify a constitutional right that was violated. Moreover, the evidence in the record demonstrates that the parties Watkins complains of having access to his information were in fact bound by the Finan Center's confidentiality policy. Watkins, therefore, has failed to demonstrate how his constitutional rights were violated as to these claims.

### 3. Due Process Claims

Involuntarily committed patients at state psychiatric facilities are afforded liberty interests under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Youngberg v. Romeo, 457 U.S. 307, 324 (1982); see also Patten v. Nichols, 274 F. 3d 829, 837 (4th Cir. 2001) (applying Youngberg). In contrast to criminals "whose conditions of confinement are designed to punish," involuntarily committed individuals are entitled to "more considerate treatment and conditions of confinement." Youngberg, 457 U.S. at 321–22.

To determine whether an involuntarily committed individual's substantive due process rights have been violated, the Court weighs "the liberty of the individual" and "the demands of an organized society." Id. at 319 (quoting Poe v. Ullman, 367 U.S. 497, 542 (1961)). In making this assessment, the Court applies the "professional judgment" standard, in which it "make[s] certain that professional judgment in fact was exercised." Id. at 321. Under this standard, the Court presumes that decisions made by professionals are valid. Id. The Court may impose liability only when the professional's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323 (emphasis added). Put differently, a defendant's actions must have "so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional." Patten, 274 F.3d at 843.

### a. Denial of Privileges and Programming

Defendants contend the record evidence establishes that Finan Center employees exercised appropriate professional judgment when they placed certain restrictions on Watkins. The Court agrees.

Here, the evidence demonstrates that the Finan Center provided its patients a series of privileges and security levels which were based on the patient's behavior. Watkins' assertions that Dr. Passerell, Lyons, Cashdollar, Brown, Robinson, and Emerson, acted unprofessionally by using the levels as punishment rather than as a safety measure is belied by the record, as is his claim that Pence created false reports presumably in order to implement restrictive changes to Watkins' levels. Finan Center staff increased Watkins' security level when it was documented that he assaulted other patients and staff. The change in security level, and any attendant change in privileges, was due to Watkins' own actions. These actions included refusing to take prescribed medications, refusing to follow the directions of staff, and verbally and physically assaulting other patients and staff. The undisputed evidence demonstrates that Defendants exercised professional judgment in crafting and imposing the restrictions on Watkins' activities. Moreover, the restrictions furthered an important governmental interest—the orderly administration of the hospital and protection of staff and patients, including Watkins.

In short, Watkins has not demonstrated that any of the decisions regarding his security, privileges, or programming were "a substantial departure" from accepted standards of professional judgment. Youngberg, 457 U.S. at 323.

### b. Conditional Release Hearing Claims

### i. Post-Hearing Letter to the ALJ

To the extent Watkins contends that Dr. Hendershot and Perkins improperly submitted a letter to the ALJ after Watkins' conditional release hearing, Watkins fails to establish a violation of his due process rights. As noted previously, Dr. Hendershot testified on Watkins' behalf at the hearing, but thereafter Watkins assaulted patients and staff and failed to participate in his treatment regimen. As a result, Dr. Hendershot and Finan Center staff no longer supported Watkins' conditional release and she and Perkins withdrew their support. Although the ALJ denied Watkins' request for a conditional release, he did not rely on, or even reference, the letter. Watkins, therefore, has failed to demonstrate that Hendershot or Perkins' conduct "so substantially departed from professional standards" that their decision was "arbitrary and unprofessional." Patten, 274 F.3d at 843. To the contrary, Hendershot and Perkins acted professionally in withdrawing their support for Watkins' conditional release when his behavior and compliance with treatment protocols changed for the negative. Further, Watkins fails to demonstrate constitutional injury arising from the submission of the letter where, as here, the ALJ did not rely on Dr. Hendershot and Perkins' letter in denying Watkins' request for conditional release.[11] (Defs.' Mot. Ex. 11, ECF No. 30-13).

---

[11] To the extent that Watkins' allegations regarding the letter could be construed to raise a procedural due process claim, this claim also fails. Even if the submission of the letter was procedurally improper, the evidence establishes that the ALJ did not rely on the letter when he decided to deny Watkins' request for conditional release. (Defs.' Mot. Ex. 11).

### ii. False Testimony

As to Watkins' assertion that Dr. Hendershot falsely testified during the conditional release hearing, Defendants do not address it. Instead, Defendants confuse Watkins' allegations related to the post-hearing letter and the allegations regarding evidence presented at Watkins' hearing. Defendants state: "Mr. Watkins alleges that, in this letter, Dr. Hendershot 'entered a false statement that this actually did happen.'" (Defs.' Mot. at 7). Watkins, however, alleges that "Dr. Hendershot mentioned an alleged incident by the Plaintiff <u>at his Dorsey Release Hearing</u> on May 8th, 2018, that never happened and was dismissed by a Circuit Court Judge because even the alleged victim vehemently denied that she was inappropriately touched by the victim." (Compl. at 9) (emphasis added). Watkins further alleges that "This false testimony . . . was one of the reasons given by the [ALJ] for denying [Watkins' conditional release]." (<u>Id.</u>). Because Defendants confused the two claims, the Court will grant Defendants fourteen days to file a line with the Court addressing whether they intend to file a dispositive motion or answer as to this claim.

### b. Failure to Protect and Use of Force

On July 23, 2015, Watkins was involved in an altercation with another patient which Lyden attempted to break up. Lyden identified Watkins as the aggressor and noted that in attempting to break up the fight, he was required to restrain Watkins. Watkins does not demonstrate any injury arising from the altercation with the other inmate or Lyden restraining him. As a result, Watkins fails to establish that Lyden's conduct was "a substantial departure from accepted professional judgment." <u>Youngberg</u>, 457 U.S. at

323. To the contrary, the undisputed evidence demonstrates that Lyden exercised professional judgment in responding to the spontaneous altercation between Watkins and the other patient and breaking up the fight. The record reveals that Watkins was the aggressor in the altercation and a reasonable amount of force was used to insure the safety of Watkins, the other patient, and staff. Watkins fails to present any summary judgment evidence to contradict the record. Thus, the Court concludes that Watkins fails to create a dispute of material fact as to his claim against Lyden.

In sum, Watkins has not established potential constitutional violations as to any of the claims for which Defendants seek summary judgment. Accordingly, the Court will grant Defendants' Motion.

### III. CONCLUSION

For the foregoing reasons, the Court will dismiss Judge Leasure, deny Defendants' Motion to Consolidate, and grant Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, construed as a motion for summary judgment. The Court will also grant Defendants fourteen days to file a line with the Court addressing whether they intend to file a dispositive motion or an answer as to Watkins' claim that Dr. Hendershot presented false testimony at his conditional release hearing.
A separate Order follows.

July 19, 2018  /s/
_____  _____
Date  George L. Russell, III
  United States District Judge